

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

WK:SCJ/PTH/MEB
F. #2013R01203

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 9, 2018

By Hand and ECF

The Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Discala, et al.
     Criminal Docket No. 14-399 (S-1) (ENV)

     United States v. Goodrich
     Criminal Docket No. 16-399 (ENV)

Dear Judge Vitaliano:

   The government respectfully submits this letter in response to the defendant Darren Goodrich's sentencing submission, filed on May 24, 2018 ("Goodrich Mem."; ECF No. 618), for the two above-referenced cases, Criminal Docket No. 14-399 (the "Discala case") and Criminal Docket No. 16-630 (ENV) (the "DNJ case"), which have been consolidated for sentencing. The defendant is scheduled to be sentenced on July 12, 2018 at 11:00 a.m.

   In his sentencing submission, Goodrich argues that a sentence of no greater than 41 months, the minimum sentence permitted by the plea agreement in the DNJ case,[1] is a more than sufficient sentence for both the Discala case and the DNJ case. For the reasons set forth below, the government submits a term of imprisonment of 60 months, the applicable advisory range pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), is appropriate for the Discala case, and a term of imprisonment of 51 months, the maximum sentence permitted by the plea agreement in the DNJ case, to run concurrently in the Discala case, is appropriate for the DNJ case.

---

[1] The plea agreement in the DNJ case provides that the if the Court accepts the terms of that plea agreement, Goodrich will be sentenced to a term of imprisonment of between 41 and 51 months, to run concurrently to any sentence imposed in the Discala case, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. Goodrich Mem., Ex. B at 2.

I.       The Offense Conduct

Goodrich is a 39-year-old resident of Manhattan Beach, California.  Presentence Investigation Report dated February 8, 2018 ("PSR") at 2.  At the time of the charged offense conduct, Goodrich was employed as a broker at BMA Securities, LLC ("BMA"), a broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").  Id. ¶ 7.  Goodrich began working at BMA in 1999, and became a head trader and Managing Director.  Id. ¶ 82.

Goodrich was charged with participating in two separate "pump and dump" stock fraud schemes: (1) the scheme charged in the DNJ case, which spanned approximately 2007 through 2010, and (2) the scheme charged in the Discala case, which spanned approximately 2013 through 2014.  Each scheme will be addressed in chronological order.

A.  The DNJ Case

Beginning in or around 2007 and continuing through 2010, Goodrich conspired with others, including Nathan Montgomery, Samuel DelPresto, and Donald Toomer, all of whom have been indicted in the District of New Jersey, to manipulate the price of four different stocks: NXT Nutritional Holdings, Inc. ("NXTH"), Bioneutral Group, Inc., ("BONU"), Clear-Lite Holdings, Inc. ("CLRH"), and Mesa Energy Holdings, Inc. ("MSEH") (collectively the "Target Companies").[2]  PSR ¶¶ 7-9.

Montgomery and DelPresto were stock promoters.  Id.  Toomer was an investment adviser at an investment advisory firm.  Id.  Montgomery, DelPresto, Toomer, Goodrich, and others perpetrated a scheme to "pump-and-dump" shares of the Target Companies' stock.  Id.  Each cycle generally involved three steps: first, Montgomery and DelPresto obtained control over large blocks of the free-trading shares of the Target Companies' stock.  Id. ¶ 10.  Second, the co-conspirators "pumped" the price of those shares by, among other things, engaging in manipulative trading and disseminating promotional materials touting the stocks, which encouraged others to purchase them.  Id.  Finally, the co-conspirators "dumped" the stocks by selling large volumes of the Target Companies' stock to victim-investors throughout the promotional campaigns.  Id.  Following the dump phase, the Target Companies' artificially inflated stock prices dropped, causing victim-investors to suffer losses.  Id.

As part of the first step, DelPresto searched for and identified developmental stage private companies seeking financing with stories that could be promoted (the "Private Companies").  Id. ¶ 11.  DelPresto offered to raise "seed" capital for the Private Companies and

---

[2] Montgomery and DelPresto have pleaded guilty to conspiring to commit securities fraud in the District of New Jersey.  United States v. Montgomery, No. 16-CR-407 (JLL); United States v. DelPresto, No. 16-CR-631 (JLL).  Toomer was indicted on securities fraud charges in New Jersey, but his case was voluntarily dismissed by the government in May 2017 on statute of limitations grounds.  See United States v. Toomer, No. 16-CR-640 (JLL), ECF No. 22.  Toomer was later indicted in June 2017 on related tax fraud charges in the District of Nevada.  See United States v. Toomer, No. 17-CR-193 (CWH).

2

to take them public through a reverse merger, i.e., the acquisition of a public shell company. Id. Montgomery and DelPresto typically purchased the majority of free-trading shares of the public shell companies and, following the reverse mergers with the Private Companies, owned the majority of free-trading shares of the newly formed public entities—namely, the Target Companies. Id. The co-conspirators took numerous steps to conceal their involvement in the overall scheme and their ownership of the stock of the Target Companies, including using brokerage accounts held in the names of entities they controlled, friends, family members, and/or third party nominees (the "Nominee Accounts") to purchase and hold the stock until later phases of the scheme. Id.

During the second step of the scheme, after obtaining control of the majority of free-trading shares of the Target Companies, the co-conspirators generated interest in the Target Companies and fraudulently inflated the price and trading volume of their shares through coordinated trading of the stock of the Target Companies between the Nominee Accounts and other accounts that the co-conspirators controlled. Montgomery also paid cash kickbacks to Toomer to induce Toomer to purchase the stock of certain of the Target Companies on behalf of his investment clients. Id. ¶ 12. Toomer bought the stock in the early phases of each cycle of the scheme while the stock price and trading volume were low and during a time when Montgomery and DelPresto controlled the majority of the free-trading shares. Id. The purpose of these purchases was, among other things, to create the false impression of market interest and demand in the stock, to build trading volume that would be attractive to potential investors who would later receive promotional materials about the stock, and to generate income to fund the promotional campaigns that occurred in the later phases of the scheme.

Goodrich facilitated the manipulative trading in three of the four stocks described above. Id. Goodrich played a critical role in the scheme because, in addition to being Montgomery's and DelPresto's primary broker for selling their NXTH, CLRH, and MSEH stock, he was also a third-party "market maker" in those stocks, meaning a broker who bought and/or sold securities from others to help create liquidity in that particular security. Id. Being a market maker allowed Goodrich to serve as a middleman on transactions between the Nominee Accounts and Toomer's investment client accounts, and other accounts controlled by co-conspirators, without revealing to the market that these were coordinated transactions. This strategy was designed to raise interest in the stock and avoid the appearance of cross trading and/or match trading and, consequently, to avoid detection by regulators and law enforcement.

For example, on or about January 5, 2010, Goodrich, at Montgomery's direction, caused a Nominee Account held at BMA to purchase 117,000 shares of MSEH at $.76 per share. The same day, Goodrich, at Montgomery's direction, sold approximately 120,000 shares of MSEH at $.76 per share from Montgomery's account at BMA. On or about March 9, 2010, DelPresto arranged for a nominee shareholder to purchase 100,000 shares of MSEH stock from Goodrich's market making account at BMA. Goodrich had purchased the shares earlier in the day at Montgomery's direction.

Following an initial period of manipulative trading, the co-conspirators then engaged in carefully coordinated promotional campaigns designed to further inflate the price of the Target Companies' stock. Id. ¶ 12. The promotional materials included press releases from the Target Companies and newsletters and/or mailers prepared by third parties. In each cycle of

3

the pump-and-dump scheme, the co-conspirators controlled the timing of the promotional activities to ensure that they would commence after the Target Companies' stock had been sufficiently manipulated to create the appearance of real market interest.

Finally, after fraudulently inflating the price of the Target Companies' stock in the manner described above, the co-conspirators sold or planned to sell their stock to unsuspecting victim-investors at the fraudulently inflated prices. This large-scale selling of the Target Companies' stocks generally caused the share prices to plummet, resulting in losses to the victim-investors who bought the stock at the inflated prices.

In total, Montgomery made approximately $20 million in trading profits and DelPresto made approximately $13 million in trading profits in all four stocks, and Goodrich was responsible for selling over $30 million worth of NXTH, CLRH, and MSEH into the market for DelPresto and Montgomery. Goodrich stipulated in the DNJ case plea agreement that Goodrich's "gross profits from the scheme, which consisted of trading commissions relating to trades that he executed in furtherance of the scheme, were approximately $1.5 million." Goodrich Mem., Ex. B at 8.

B. The Discala Case

Between 2012 and 2014, co-defendant Abraxas J. Discala lead a scheme to manipulate the stocks of multiple microcap or "penny" stocks, including the stock of CodeSmart Holding, Inc. ("ITEN"), The Staffing Group ("TSGL"), Starsteam (SSET), and Cubed, Inc. ("CRPT") (collectively the "Manipulated Public Companies"). PSR ¶¶ 14-32. Discala offered to raise capital for start-up private companies and to take them public through a reverse mergers with public shell companies in exchange for obtaining control of a large portion of the free-trading stock, which Discala and his co-conspirators artificially inflated through manipulative trading using corrupt brokers and promotional campaigns that, at least for ITEN, involved the dissemination of false press releases. Id.

Discala and others arranged a reverse merger between ITEN and a public shell company, which occurred on or about May 3, 2013. Discala and his co-conspirators obtained all the unrestricted ITEN stock at pennies per share. Ind. S-1 ¶¶ 14-16. Discala and co-defendants Marc Wexler, Matthew Bell, Craig Josephberg, Darren Ofsink and Michael Morris made significant profits from selling ITEN stock, totaling approximately $7 million. Much of the early trading of ITEN in May and June 2013 was coordinated trading between Discala, Wexler, and Bell, an investment adviser who purchased large amounts of ITEN stock at increasing prices for his clients. Josephberg, a registered broker, also purchased ITEN stock for his clients at Discala's direction. ITEN's Chief Executive Officer Ira Shapiro issued numerous press releases, some of them untrue, to generate interest in ITEN stock. FINRA has calculated from trading data that over 800 investors who purchased ITEN stock in the public market suffered approximately $13.1 million in losses.

4

Goodrich became one of Discala's brokers in or around June 2013, and Discala opened multiple trading accounts at BMA.[3] Discala used the BMA accounts to trade in a number of stocks, including the stock of the Manipulated Public Companies.[4] For example, Discala's had over $100,000 in trading losses in ITEN stock spread over three different accounts at BMA for trades made in September, October, and November of 2013.[5]

During the five-week trial of Discala and attorney Kyleen Cane, which began in April 2018 and concluded in May 2018, the government presented a number of co-conspirator witnesses, including Wexler, Bell, Marlene Goepel, Victor Azrak, and Jaimie Sloan, who testified about their participation in the stock manipulation schemes orchestrated by Discala. Several trial witnesses explained that while Discala and others, including Wexler, Bell, and Josephberg, received large blocks of free-trading ITEN stock that they were able to sell for significant profit during the stock manipulation scheme, before the price of ITEN stock collapsed, the co-conspirators did not receive free-trading shares of CRPT, and instead, Cane, who was acquitted of all charges at trial, held all the CRPT free-trading shares in "escrow." The government showed that Cane sold CRPT free-trading stock through a nominee account held at Glendale that Cane controlled.

On March 28, 2014, 200 shares of CRPT were sold at $5 per share.[6] Based on the $5 share price and its outstanding common stock, CRPT had a market capitalization of $150 million. S-1 Ind. ¶ 31. On April 22, 2014, after 15 days of no trading activity, CRPT's stock started trading in earnest at a price of $5.25 per share. Id. Between April 22, 2014, and June 23, 2014, Discala and the other conspirators, including Goodrich, engaged in manipulative trading to walk the price of the CRPT stock up to its peak price of $6.75 per share. According to trading data, CRPT stock was still trading at or over $6.75 per share on July 16, 2014. Discala, Cane, and others were arrested on July 17, 2014, and the SEC temporarily halted trading in CRPT.

During the Discala and Cane trial, the government played a number of intercepted wiretap calls for the jury which either involved Goodrich as a participant of the call or the

---

[3] Documents produced to the government by BMA include account opening documents for OmniView Capital LLC, a company Discala controlled, dated June 23, 2013. Goodrich is listed as the account representative. Discala opened additional accounts at BMA in September 2013.

[4] Discala maintained multiple trading accounts multiple broker-dealers, including BMA, Meyers & Associates (Craig Josephberg's firm), Securities, Inc. ("Glendale") and Raymond James. Discala's trading accounts at Halcyon Cabot Partners ("Halcyon") were closed at around the time that Josephberg moved from Halcyon to Meyers & Associates.

[5] Discala and Wexler made the bulk of their ITEN profits by quickly unloading their ITEN stock at artificially inflated prices beginning in May 2013. In later months, both Discala and Wexler purchased smaller amounts of ITEN stock in an attempt to keep the stock price up.

[6] This trade was between two accounts at Glendale that Cane controlled, and this trade was later cancelled.

subject of the call, which showed the importance of the role Goodrich played in the scheme to manipulate the price of CRPT stock in the summer of 2014, and Goodrich's awareness of Cane's escrow control over the stock. There were multiple calls where Discala directed Goodrich and Goodrich's assistant at BMA to move BMA's bid or ask price on the CRPT stock. For example, the following conversation occurred on May 5, 2014:

> GOODRICH: Hey buddy.
>
> DISCALA: Yeah, hey buddy, yeah [UI],[7] can you get him off that 451, he's killing my box here.
>
> GOODRICH: Yeah, yeah, he's moving up, you want him up right?
>
> DISCALA: Yeah, up, because it's 526, 52- he's in the middle, I don't know, somehow he's in the middle of the 5's at 451. Or something, I don't know how he possibly did that.
>
> GOODRICH: So where do you want him, I'll call him right now.
>
> DISCALA: 525.
>
> GOODRICH: 525, you got it.
>
> DISCALA: Bye.

GX 198-3-T (Session 2174).

During other intercepted conversations, Discala not only explained to Goodrich how the "escrow" Cane controlled worked, but Discala also encouraged Goodrich to meet with Cane in person so she could also explain the escrow to Goodrich herself. Discala also agreed to provide a kickback to Goodrich in the form of 25,000 shares of CRPT at $.25 per share, at a time when CRPT was trading at well over $5 per share. For example, the following conversations was intercepted on May 9, 2014:

> GOODRICH: … so when I talk to Kyleen, run me through the escrow thing she's doing again (background noise).
>
> DISCALA: Yeah don't, she doesn't even like to talk about it, but there's like um, you know, past Rich's counsel and Bruce's counsel. But there are really five escrows out there, there is no stock in the 267, and once you get face to face with her, she'll explain it to you and you'll be part of that team. But yesterday

---

[7] UI is a reference to "unintelligible."

6

|              | she mentioned that she wanted to give one of her BD's you know what we pay, 25 thousand [shares] at 25 cents, you know what we pay, well I said if you are going to do that with whoever … but I said if you're doing it for them, you have to do it for Darren, and um, |
|---|---|
| GOODRICH: | I really appreciate that |
| DISCALA: | No, no, that's from me, it's already done, so don't go back on, it's done. She said it's done. |
| GOODRICH: | Well, I think what I need to do is probably once I meet her over the phone is definitely fly out there and spend an hour with her. |

GX 198-6-T-E (Session 3623).

Goodrich, in fact, did meet Cane in person. Afterwards, Discala and Goodrich discussed the meeting. The following call was intercepted on May 20, 2014:

| DISCALA: | What, what did Kyleen tell you about the Cube, did she explain the Cube to you? |
|---|---|
| GOODRICH: | Yep she explained all that, she explained the escrows, everything so we're on the same page, I really think that we are gonna [UI] off, we really have a good relationship. |

GX 198-20-T-E (Session 7901).

Cane and Discala also discussed the value that Goodrich would add to scheme and paying him a kickback. On May 21, 2014, the following call was intercepted:

| DISCALA: | … Darren … really loved you and I think that Darren Goodrich is just a good human being. |
|---|---|
| CANE: | Yeah I really liked him as well. Um do you want me to um… |
| DISCALA: | Yeah 50. |
| CANE: | Let me know if you want…Sorry. |
| DISCALA: | Yeah 50 [thousand shares]. |
| CANE: | I'll do something with him then. |

7

> DISCALA: Yeah 50 [thousand shares] at 25 [cents].
>
> CANE: 50 at 25, we were doing 25 at 25 with Glendale.
>
> DISCALA: Yeah I know, but I think you watch he's going to be much more helpful.
>
> CANE: Really, ok. Alright, I'll work with him.

GX 198-23-T (Session 8266).

On May 23, 2014, the co-conspirators briefly lost control of the price of CRPT stock when Cane's broker at Glendale was on vacation. Discala had the following conversation with Goodrich on May 23, 2014, after the CRPT stock price peaked at over $7 per share due to a lack of coordination, and the co-conspirators agreed to bring it back down:

> DISCALA: Hey pal. So Kyleen's retweeking this thing [the price of CRPT] to 6.35, I just wanted to let you know.
>
> GOODRICH: Okay
>
> DISCALA: So, let's, so um I'm going to make sure that, I'm going to call her back and make sure she gets that stuff [the CRPT stock] to you, either today or Thursday morning, so that this never happens again.
>
> GOODRICH: Okay
>
> DISCALA: Alright, can you go up, can you go 6.29 for one right now, just because.
>
> GOODRICH: Oh, on the bid?
>
> DISCALA: [UI] yeah, only cause look at VFIN, you see that—
>
> GOODRICH: Yeah, yeah, absolutely
>
> DISCALA: Why is, why is VFIN at $1 or is it, or is that just me?
>
> GOODRICH: No, they went down to $1, looks like they just didn't have a lot to buy, so they got hit. They were at like, I think they were at 6.25 or something, looks like they got hit and then they were down.
>
> DISCALA: Okay, so 6.2, thank you very much, and I'll make sure that Kyleen calls you now, to make sure you

8

|  |  |
|---|---|
|  | have that, so that, I, so if, if I'm ever on a plane, I, I want to work with Darren from now on is what I'm going to tell her. So 50 at 25. |
| GOODRICH: | Sounds good. Bye. |

GX 198-30-T (Session 9289).  Discala also told co-conspirator Wexler to lobby Cane on Goodrich's behalf because Goodrich was helping with the CRPT scheme.   For example, on June 5, 2014, Discala and Wexler had the following exchange:

|  |  |
|---|---|
| DISCALA: | Just write back to that email that you got with Kyleen, Darren, and myself that we're going to do a call so that you, Kyleen, you gotta take care, GP, we gotta take care of our boy Darren. He's the best. That's all. |
| WEXLER: | Alright, so write back saying that we gotta take care of Darren? Or…or lets do- |
| DISCALA: | No, no, no. Just say we gotta take care of our boy Darren. He's the best. That's it. No big deal. It's just showing…it's showing Darren good emotion from us, you understand? |
| WEXLER: | Darren is on there too, right? |
| DISCALA: | Yeah, see, because, I mean, he got whacked today. For eight hundred, you know? And he stood there. |
| WEXLER: | Yeah. |
| DISCALA: | You know, he's...he's the real deal. |
| WEXLER: | I know. |

GX 198-46-T (Session 14802).  When Discala indicated that Goodrich got "whacked today" and "stood there," the government submits that Discala meant that a bid that Goodrich had placed to purchase 800 shares of CRPT stock to make it appear that market demand for CRPT existed was filled and Goodrich purchased the stock.  While Cane did not transfer 25,000 shares of free-trading CRPT stock to Goodrich prior to her arrest on July 17, 2014, that does not mean that she did not plan to do so as agreed.  For example, there were multiple conversations in May 2014 about the 25,000 CRPT shares that Cane agreed to transfer to her broker at Glendale, for $.25 cents per share, but Cane did not transfer 25,000 shares of free-trading CRPT stock to GCEF Opportunity Fund, an entity associated with the Glendale broker, until June 27, 2014.   Had the stock transfer to Goodrich occurred, and if Goodrich were able to sell those shares at the manipulated market price of over $6.50 per share, Goodrich could have received up to $150,000 in profit.

9

II.     Procedural History

      A.     The Indictments, Goodrich's Arrest and Guilty Pleas in the Discala case

Discala, Shapiro, Cane, Wexler, Bell, Josephberg and Azrak were indicted and arrested in July 2014. Goodrich, Darren Ofinsk, and Michael Morris were added to the case pursuant to a superseding indictment in November 2015. Goodrich was arrested on November 4, 2015, at his residence in Manhattan Beach, CA. PSR ¶ 34. On June 27, 2016, Goodrich pled guilty pursuant to a plea agreement to Count One of the superseding indictment, which charged Goodrich and others with conspiring to commit securities fraud, in violation of Title 18, United States Code, Section 371. PSR ¶ 1; Goodrich Mem., Ex. A.

In the Discala case plea agreement, the government's estimated that Goodrich's applicable advisory Guidelines adjusted offense level, assuming a three-point reduction for acceptance of responsibility, would be level 27,[8] and if the defendant was in Criminal History Category I, he would have a Guidelines range 60 months' imprisonment due to the statutory maximum sentence of five years. Goodrich Mem., Ex. A at 3. Goodrich stipulated to this Guidelines calculation. The plea agreement also required Goodrich to forfeit $3,938, and to pay restitution in "the full amount of each victim's losses as determined by the Court." Id. at 2.

The plea agreement loss calculation included a 20-level enhancement based on an intended loss amount of more than $20,000,000. Id. at 2. While the Discala case plea agreement calculation included a 4-level enhancement for Goodrich's status as a registered broker, U.S.S.G. § 2B1.1(b)(19)(A)(ii), it did not include any additional enhancements related to number of victims, hardship to victims, or the use of mass-marketing. In any event, even at a level 27, the applicable Guidelines range is capped by the applicable maximum statutory sentence of 60 months.

      B.     The Guilty Plea in the DNJ case

After Goodrich entered a guilty plea in the Discala case, Goodrich agreed to plead guilty to an Information in the DNJ case. The charging document and plea agreement were prepared by the District of New Jersey, but the parties agreed to transfer the DNJ case to this District, pursuant to Rule 20 of the Federal Rules of Criminal Procedure, for a guilty plea and sentencing. No. 16-CR-630 (ENV). Goodrich plead guilty to Count One of the Information on January 31, 2017.

The plea agreement in the DNJ case provides that, pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the government and Goodrich agreed that the appropriate sentence in the NJ case would be a sentence within the range of 41 to 51 months' imprisonment, which must run concurrent to any sentence imposed on Goodrich in the Discala case. Goodrich Mem., Ex. B at 2. In addition, the parties agreed that no forfeiture, restitution, or fine should be ordered in the DNJ case if Goodrich pays disgorgement to the SEC totaling

---

[8] The Discala case plea agreement has an error in that the Base Offense Level under U.S.S.G. § 2B1.1(a)(1) should be a 6, not a 7. U.S.S.G. § 2B1.1(a)(1).

10

approximately $805,168.  Goodrich Mem., Ex. B at 4.  See also Securities and Exchange Commission v. Samuel DelPresto, et al., No. 15-CV-8656 (JLL) (D.N.J., filed Dec. 15, 2015).

      C.      The PSR and the Sentencing Guidelines

On February 8, 2018, the Probation Department issued its PSR in this case.  In the PSR, the Probation Department determined that, although the DNJ case and Discala case were two separate and unrelated securities fraud schemes, they should be grouped for Guidelines calculations purposes based on the aggregate loss amount, pursuant to Guidelines Section 3D1.2(d).  PSR ¶ 35.  By combining the aggregate loss, calculated by the Probation Department as $52.4 million of intended loss in the Discala case and the $1.5 million earned in commissions in the DNJ case, the Probation Department determined that the total offense level under the Guidelines was 31, based on a base offense level of 6, a 22-point enhancement for an intended loss in excess of $53.9 million, a two-point enhancement for mass marketing, a four-point enhancement for Goodrich being a registered securities broker at the time of the offense, and a three-point reduction for acceptance of responsibility.  PSR ¶¶ 45-56.  The Probation Department also determined that Goodrich fell within Criminal History Category I, which resulted in an applicable advisory Guidelines range of imprisonment of 108-135 months, which was adjusted downward to a restricted Guidelines term of imprisonment of 60 months on each count due to the applicable statutory authorized maximum sentences.  PSR ¶¶ 88; U.S.S.G. § 5G1.2(b).

While it does not appear that Goodrich directly participated in a mass-marketing campaign, and the government did not include that enhancement in the Discala case plea agreement, the government does submit that Goodrich likely was aware, or it was reasonably foreseeable to him, that Goodrich's co-conspirators in both the DNJ case and the Discala case engaged in promotional campaigns to encourage investors to buy the manipulated stocks.  Also, the government notes that neither the Probation Department nor the government in the Discala case included in the applicable Guidelines calculation an enhancement for the number of victims under Guidelines Section 2B1.1(b)(2), although there were clearly more than 10 victims in both cases, including several CRPT victims who testified at Discala's trial that they suffered financial hardship due to their losses.  Since CRPT was still in the process of being pumped when Discala was arrested and much of the trading appeared to be coordinated among co-conspirators, the government did not quantify victim losses prior to Goodrich entering his guilty plea.  However, since June of 2016, particularly in preparation for the trial of Discala and Cane, the government identified a number of CRPT victims.  FINRA, through an analysis of the trading data, also identified over 80 investors who purchased CRPT stock on the open market who appear to also be victims.  In any event, any victim enhancement would not change the applicable Guidelines range of 60 months due to the statutory maximum sentence.

With respect to loss in the Discala case, the intended loss amount was calculated based on the increase in CRPT's market capitalization based in its manipulated stock price during Goodrich's participation in the fraud scheme.  Because it does not appear that Goodrich was involved in the formation of CRPT, the efforts to take CRPT public, or the artificially high opening stock price of $5 per share, intended loss amount was calculated by multiplying the fraudulent increase in CRPT's stock price from $5 per share to $6.75 per share ($1.75), multiplied by the number of outstanding shares (approximately 30 million), for a total intended

11

loss of approximately $52.5 million. PSR ¶ 37, 39, citing U.S.S.G. § 2B1.1, Application Note 3F(ix). As Goodrich points out in his sentencing submission, the Discala case plea agreement includes a Guidelines calculation based on a loss amount of in excess of $20 million, and not a loss amount in excess of $25 million but less than $65 million, which would have resulted in a 2-level higher adjusted offense level although it would not affect the applicable Guidelines range due to the statutory maximum sentence. See Goodrich Mem. at 22, note 2. During Goodrich's plea allocution, the government stated the loss figure in the plea agreement was the "difference between where the stock price began and where it ended up during the manipulation scheme multiplied by the number of outstanding shares." 6/27/16 Goodrich Plea Tr. at 34.

With respect to the loss in the DNJ case, although the government determined that Goodrich's co-conspirators made more than $30 million in illicit trading gains based on trades Goodrich had executed for them, the DNJ determined that it could not reasonably determine the loss suffered by the victim investors and used the amount of Goodrich's gain alone, calculated as the gross commissions earned by Goodrich on those trades, or $1.5 million, as the appropriate loss amount. PSR ¶ 38; see also U.S.S.G. § 2B1.1, Application Note 3B.

III.     A Guidelines Sentence Is Appropriate in Light of 18 U.S.C. § 3553(a) Considerations

　　A.     Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

Later, in Gall v. United States, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

12

B.     Application of Law

As explained in greater detail below, the government respectfully submits that the Court should impose a sentence within the advisory Guidelines range of imprisonment of 60 months in the Discala case because such a sentence is appropriate to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). A sentence within the advisory Guidelines will also further the aims of specific and general deterrence. See id. §§ 3553(a)(2)(B), (a)(2)(C).

For the DNJ case, a sentence of 51 months, the high-end of the stipulated sentencing range, to run concurrently to the sentence in the Discala case, is appropriate.

1.    Loss Under the Guidelines in Securities Fraud Cases

Goodrich asks for a total sentence of 41 months' imprisonment, the minimum sentence of imprisonment permitted by the DNJ case plea agreement. Goodrich does not dispute that the Court could sentence him to up to 51 months in prison in the DNJ case, or up to 60 months' imprisonment in the Discala case, or that the applicable advisory Guidelines range in the Discala case is 60 months' imprisonment, but Goodrich argues that the applicable Guidelines range overstates the seriousness of his offenses. The government disagrees, particularly in light in the advantageous plea arrangements that Goodrich negotiated with the government, which caps Goodrich's total exposure for two serious, and separate, securities fraud schemes to 60 months' imprisonment.

a.    Applicable Law

Application Note 3(A) to U.S.S.G. § 2B1.1 explains that loss under § 2B1.1 is the "greater of actual loss or intended loss." Intended loss means "(I) the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claimed exceeded the insured value)." U.S.S.G. § 2B1.1, Application Note 3(A)(ii). The Second Circuit has indicated that, under this amendment, there is a rebuttable presumption that the defendant intended for his victims to lose the entire face value of the object of the fraud. United States v. Jean, 647 Fed. Appx. 1, 3 (2d Cir. April 22, 2016).

Application Note 3(F)(ix) to U.S.S.G. § 2B1.1, titled the "Fraudulent Inflation or Deflation in Value of Securities or Commodities," sets out a rule for use in calculating loss in securities fraud cases. Application Note 3(F)(ix) explains in pertinent part:

> In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—

13

>   (I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
>   (II) multiplying the difference in average price by the number of shares outstanding.

U.S.S.G. § 2B1.1, Application Note 3(F)(ix).

### b. Discussion

As set forth below, the Goodrich's arguments that the intended loss calculation in the Discala case should be discounted fails on the merits. First, the loss amount was appropriately calculated here. Intended loss from the scheme as a whole, which Goodrich joined and actively participated in, is the appropriate loss calculation where it exceeds the actual loss calculation. U.S.S.G. § 2B1.1, Application Note 3(A). Second, the intended loss calculation used by the government does not overstate the harm caused by the fraud – which was interrupted during the pump phase of the scheme by the arrests of Discala and others on July 17, 2014. The government calculated Goodrich's intended loss based on the fraudulent increase in the CRPT's stock price from $5 per share and to its peak stock price of $6.75 per share. Unlike other defendants in the scheme, the government does not seek to hold Goodrich responsible for the difference between $0 and $6.75 per share for an essentially worthless stock, as it did not appear that Goodrich was actively involved in the scheme prior to when CRPT first began trading at or above $5 per share.

Furthermore, in this case, the Guidelines, which would otherwise be in the 108-135 month range, have been capped at a total of 60 months' imprisonment.

In addition, while victim losses were not quantified in the DNJ case, if Goodrich's co-conspirators made over $30 million in trading profit based on trades executed by Goodrich, it is reasonable to assume that victims who purchased that stock at fraudulently inflated prices suffered losses in at least that amount. In the Discala case, the government has estimated victim losses associated with CRPT to be approximately $4.2 million. Even if the Court was inclined to consider actual victim losses instead of the higher intended loss amounts calculated by the government, combined with the number of victims who suffered as a result of the crimes, and Goodrich's status as a registered broker means that even under the most conservative of Guidelines calculations, a sentence of 51 months' imprisonment for the DNJ case and 60 months' imprisonment for the Discala case would be entirely appropriate and reasonable.

### 2. Nature and Circumstances of the Offense

As set forth in detail above, Goodrich participated in market manipulation schemes that artificially inflated the price of several stocks in two separate and unrelated fraud schemes, and caused serious harm to the investing public. These crimes were serious. See 18 U.S.C. §§ 3553(a)(1), (2)(A).

14

In his sentencing submission, Goodrich substantially minimizes his role in the offense conduct, particularly with respect to the DNJ case. The manipulative trades that Goodrich executed represented a key aspect of the scheme. For each of the stocks that were pumped and then dumped, a critical phase of duping the investing public into purchasing near worthless stock at highly inflated prices was manipulating the subject company's stock price through coordinated, fraudulent trades. The effect of these trades was to create the false impression that these companies had real market interest and substantial trading volume when, in reality, the trading was controlled by a small set of stock promoters and their nominees who controlled the majority of the free-trading shares of the company's stock. Accordingly, the phase of the scheme for which Goodrich played a key role (the manipulative trading) cannot be viewed as minor, trivial, or incidental to the scheme's core objects. To be sure, Goodrich's role is nothing like a money mule in a narcotics conspiracy, or a complicit friend or family member helping a person engaged in fraud transfer funds by using their bank or brokerage accounts, or nominee shareholders who agree to put stock in their name even though they are not the beneficial owners of it. All of those people could face criminal liability, but likely would have powerful arguments that they occupied minor roles in the overall criminal activity at issue. Goodrich, on the other hand, controlled a critical piece of the scheme that was fundamental to its success. Even though the scheme in the Discala case had not yet had an opportunity to succeed due to the arrests of the co-conspirators in July 2014, Goodrich also played a critical role in assisting in Discala's efforts to place artificial orders for CRPT stock to create the false impression that there was more demand for that stock than really existed.

Moreover, contrary to Goodrich's contentions, his role could not have been filled by any other trader, and certainly not through "the use of any online trading platform." Goodrich Mem. at 27. Goodrich's trading involved close coordination with his co-conspirators. His trading capabilities were enhanced by his firm's ability to operate as both a broker and a market maker. Indeed, the DNJ investigation revealed examples of Goodrich executing coordinated and manipulative trades between his firm's market making accounts and other accounts at his firm that his co-conspirators owned. The market making account allowed Goodrich to add a layer in between the co-conspirator accounts, which helped avoid detection by market surveillance and regulators. Goodrich's co-conspirators actively sought his assistance, not simply because he was a run-of-the-mill trader, but because of his trading skills, capabilities, and willingness to take on the trading risks inherent in these fraudulent schemes.

In assessing the nature and circumstances of the offense, the Court also should consider that Goodrich's involvement in scheme charged in the DNJ case was extensive and was not limited to an isolated set of trades, or even one manipulation. Rather, Goodrich handled the manipulative trading for three separate pump-and-dumps that occurred over a two-year period. He sold approximately $30 million worth of shares of the subject stocks into the market from co-conspirator accounts in furtherance of the scheme, generating around $1.5 million in gross commissions. These circumstances further undermine Goodrich's efforts to minimize his role in the criminal conduct.

Goodrich also has claimed that "the Government has failed to identify a single victim who was harmed by [his] role in either scheme." Goodrich Mem. at 33. In fact, the

government has identified well over a hundred CRPT victims in the Discala case. Furthermore, the fact that the government has not identified specific victims for purposes of restitution in the DNJ case does not mean that these were victimless crimes, or that Goodrich's conduct did not cause real harm to real investors. Quite the opposite is true.

The victims of the DNJ case are the individual investors who purchased the stock of the subject companies during the time period of the schemes, and after the price and trading volume of the stock had been artificially inflated through Goodrich and his co-conspirators' fraudulent conduct. These victims purchased shares at prices that did not accurately reflect their true market value. When the fraudulent promotions ended, the stock prices plummeted and the victims were left with shares of stock that had little to no value. In the DNJ investigation, special agents of the Federal Bureau of Investigation worked to identify potential victims of the DNJ scheme, including reviewing trading records and other documents relating to trading in the subject companies' stock during the time period of the conspiracy. This review revealed that there are potentially tens of thousands of victims; that is, individuals who purchased those stocks during the time period of the scheme. Goodrich, as the main broker/trader for the co-conspirators in the DNJ case, certainly sold many of the inflated shares from the co-conspirators' accounts to victim investors who later suffered monetary losses.

In short, the nature of the charged schemes and Goodrich's roles in them demonstrate unequivocally that his unlawful conduct caused real harm to numerous investors.

3. History and Characteristics of the Defendant

Goodrich argues that he deserves a sentence of imprisonment of no longer than 41 months in total, for both the Discala case and the DNJ case, because of his personal background and his history and characteristics. Specifically, Goodrich characterizes himself as a hard-working and devoted father, as well as a generous supporter of friends, family, and community causes. Goodrich Mem. at 4-8. Goodrich has submitted dozens of letters from friends and family who have attested to his commitment to his family and financial generosity to members of his community.

The government notes that few, if any, of Goodrich's supporters appear to be familiar with the facts of the charged crimes, particularly the DNJ case which spanned a much longer time frame than Goodrich's involvement in the Discala case, involved multiple stocks, and resulted in a significant financial benefit to Goodrich. The two cases together show that Goodrich's behavior was not aberrant, not limited to one group of conspirators, and not the product of youthful indiscretion, but deliberate conduct by a sophisticated financial professional who had been a licensed broker for well over a decade when he became involved in the DNJ case, and, several years later, the Discala case.

Goodrich argues that he has worked hard to build up a new business for himself in renovating and flipping homes in California. With regard to Goodrich's efforts to provide for his family after being barred from the securities industry, Goodrich was productively employed at BMA at the time of the instant offense. Undoubtedly, Goodrich worked diligently in that role, yet his work ethic did not dissuade him from using his employment to perpetrate crime and

personally benefit financially as a result. While Goodrich had yet to reap much financial reward from the manipulation of CRPT stock due to termination of that scheme when Discala and others were arrested in July 2014, Goodrich earned $1.5 million in gross commissions from the scheme charged in the DNJ case. That Goodrich may have used his ill-gotten gains to help support his family in an affluent lifestyle and as a financial benefactor in his community does not excuse his conduct.

As to Goodrich's personal relationships, while he appears to be a loving father, there is nothing unique about Goodrich's history and characteristics that would justify a deviation from the otherwise-applicable Guidelines. While it is unfortunate that Goodrich's children will have to go without their father for an extended period of time, that separation is a direct result of choices that Goodrich made to enrich himself at the expense of others. Additionally, Goodrich's children appear to have a devoted mother and supportive extended family who will be able to care for them during Goodrich's incarceration.

    4.  Seriousness of the Offense and Deterrence

Goodrich also argues that a sentence no greater than 41 months' imprisonment is appropriate here, because, he argues, that sentence complies with the factors set out in § 3553(a). For the reasons explained above, the charged offenses were serious. Moreover, Goodrich used his status as a registered broker and market maker to personally profit. This abuse of trust merits a significant custodial term. Moreover, his conduct in manipulating and inflating the stock price caused significant, wholly unmitigated harm to all other investors.

The Court's sentence should also further the aims of general and specific deterrence. U.S.S.G. § 3553(a)(2)(B), (C). There is a greater need for general deterrence for fraud schemes than other crimes, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

In sum, a sentence at the applicable Guidelines range is warranted in the interest of deterrence, both specifically to this defendant and generally to the financial services industry.

17

IV.     Restitution

In the DNJ case, Goodrich and the government agreed that disgorgement to the SEC would take place in lieu of restitution, forfeiture, or a fine.

In the Discala case, the plea agreement provides that restitution will be ordered in the full amount of the victims' losses, as determined by the Court. The government has determined that the actual victim losses with respect to the securities fraud scheme involving CRPT total $4.1 million, and has provided a list of affected victims and loss amounts to the Probation Department. See Second Addendum to the PSR dated June 26, 2018.

The victim losses in CRPT were calculated as follows: (1) approximately $514,694 in CRPT trading losses by more than 80 individuals related to market trades that occurred at fraudulently inflated prices between April 22, 2014 and July 16, 2014, based on a FINRA analysis of bluesheet trading data;[9] (2) approximately $2,135,000 in losses by approximately 18 individuals and entities who purchased restricted stock directly from CRPT at $1 per share by wiring money to a bank account controlled by Cane pursuant to a private placement of CRPT stock;[10] (3) approximately $1,265,625 in losses by approximately 40 individuals who deposited money into accounts controlled by Abraxas Discala between March 12, 2014 and May 29, 2014 pursuant to "Stock Purchase Agreements" or "Participation Purchase Agreements" for CRPT stock as reflected in Government Exhibit 190-3, an analysis by Discala's retained accountant who testified at Discala's trial.[11] For investors who purchased restricted CRPT stock pursuant to the private placement at $1 per share, the fact that the stock was trading at or above $5 per share was an important factor in their investment decision. Rui Falcon was one of the CRPT private placement investors who testified at the Discala trial. See Discala Trial Transcript ("Tr.") at 1812-1827. Ms. Falcon testified that the market price for CRPT stock was an important factor in the investment decisions she made with respect to CRPT, and she was unaware that the stock price was being manipulated. For investors who deposited money into accounts controlled by Abraxas Discala for CRPT stock, they were not told that Discala did not legally own or directly control the CRPT stock that he was purportedly selling them nor that the CRPT stock price was being artificially controlled. CRPT Investors Bryan Hagen and Michael Kellner who sent money to Discala for CRPT stock also testified at the Discala Trial. See Discala Trial Tr. at 1856-70 (Kellner); 1981-99 (Hagen).

---

[9] The government excluded accounts that appeared to be associated with the defendants from the loss calculations.

[10] Cane forwarded this money to CRPT, and directed the transfer agent to issue stock certificates for restricted CRPT stock to these investors. The government excluded accounts that appeared to be associated with the defendants from the loss calculations. Approximately $260,000 was deposited in Cane's bank account prior to April 22, 2014, and $1,875,000 was deposited into Cane's bank account after April 22, 2014.

The government respectfully submits that Goodrich should be held joint and severally liable for the entire restitution amount.

V.      Conclusion

Based on the foregoing, the government respectfully requests that the Court impose a term of imprisonment within the advisory Guidelines range of 60 months in the Discala case and a sentence of 51 months' imprisonment in the DNJ case, both sentences to be served concurrently as agreed in the DNJ case plea agreement.

In addition, the government respectfully requests that the Court order Goodrich to pay restitution to the victims of the CRPT scheme as set forth above.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/
Shannon C. Jones
Patrick T. Hein
Mark E. Bini
Assistant U.S. Attorneys
(718) 254-6379 (Jones)

cc: Defense Counsel (by ECF)
    U.S.P.O. Frank M. Marcigliano (by email)